UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

**BRANDI ANNE LABORDE BETTERY**    *    **CIVIL ACTION NO. 14-3321**

**VERSUS**    *    **JUDGE HAIK**

**COMMISSIONER OF SOCIAL SECURITY**    *    **MAGISTRATE JUDGE HILL**

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Brandi Anne Laborde Bettery, born on July 14, 1979, filed applications for a period of disability and disability insurance benefits on July 1, 2012, alleging disability as of December 1, 2010,[1] due to multiple sclerosis ("MS").[2]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial

---

[1] Claimant's onset date was amended from January 6, 2007, to December 1, 2010. (Tr. 15, 60).

[2] Claimant's date last insured was September 30, 2012. (Tr. 15, 63, 118). Thus, she must establish a disabling condition before the expiration of her insured status. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[3]

**(1) Report from Dr. Timothy Honigman dated September 22, 2012**. Dr. Honigman, the non-examining state agency physician, determined that claimant could lift/carry 50 pounds occasionally and 25 pounds frequently; stand/walk and sit about six hours in an eight-hour workday, and had unlimited push/pull ability. (Tr. 68). He determined that she had a medium residual functional capacity ("RFC"). (Tr. 69).

**(2) Records from Dr. Kelly L. Cobb dated December 16, 2010 to July 30, 2012**. On December 16, 2010, claimant presented with fatigue. (Tr. 209). Associated symptoms included arthralgias and blurry vision, which occurred when she was more fatigued than usual. (Tr. 209-10). Her affective symptoms included anxious mood. (Tr. 209).

Claimant also had headaches, easy bruising, anhedonia, mood swings, personality change and difficulty concentrating. She had a history of Attention

---

[3] Although all of the medical records were reviewed by the undersigned, only those relating to the arguments raised by the parties are summarized herein.

Deficit Hyperactivity Disorder ("ADHD"), for which she was taking Adderall. (Tr. 209-10).  Dr. Cobb's assessment was fatigue, blurry vision and hormone imbalance.  (Tr. 210).

On December 21, 2010, claimant presented with fatigue.  (Tr. 206).  She felt like her brain was "swimming in her head" for one month.  The assessment was new onset multiple sclerosis[4] based on an abnormal MRI, fatigue and tobacco dependence.  Dr. Cobb advised her to stop smoking.  (Tr. 208)

**(3) Records from Our Lady of Lourdes ("OLOL") Multiple Sclerosis Center dated February 23, 2011 to July 12, 2012**.  On February 23, 2011, claimant saw Dr. Steven Snatic, a neurologist, for multiple sclerosis.  (Tr. 199).  She also had ADHD.  She was taking Adderall and Betaseron.

An MRI of the brain dated June 22, 2011, showed improvement in overall appearance with decrease in size of numerous plaques previously noted.  (Tr. 204).

---

[4]Multiple sclerosis is a "common demyelinating disorder of the central nervous system, causing patches of sclerosis (plaques) in the brain and spinal cord; occurs primarily in young adults, and has protean clinical manifestations, depending upon the location and size of the plaque; typical symptoms include visual loss, diplopia, nystagmus, dysarthria, weakness, paresthesias, bladder abnormalities, and mood alterations: characteristically, the plaques are 'separated in time and space' and clinically the symptoms show exacerbations and remissions." *Cherry v. Astrue*, 2010 WL 2134278, at *3 n. 3 (M.D. La. Apr. 8, 2010), *report and recommendation adopted*, 2010 WL 2160226 (M.D. La. May 26, 2010) (*citing Steadman's Medical Dictionary*, 27th Ed. (2007)).

There was no evidence of an active plaque at that time.

On September 28, 2011, claimant complained of being tired "all the time." (Tr. 200).  A brain MRI dated February 15, 2012, showed a change since the previous study with the interval appearance of at least one new lesion with greater conspicuity of a second lesion in the left basal ganglia.  (Tr. 202).  Restricted diffusion in these areas suggested active plaque formation.

Dr. Snatic changed claimant's medication to Tysabri (Natalizumab), for which she had her first infusion on May 17, 2012.[5]  (Tr. 196, 198).  On June 19, 2012, Dr. Snatic reported that claimant's second dose of Tsyabri on June 14 had gone well, and she already felt better overall.  (Tr. 197).  She had another injection on July 12, 2012.  (Tr. 196).

**(4) Consultative Examination by Dr. Toyin Bamgbola dated August 18, 2012**.  Claimant complained of severe fatigue starting in May 2010 associated with gradual loss of vision and parethesias involving the left side of her body.  (Tr. 225).  She was diagnosed with multiple sclerosis, for which she had had multiple

---

[5]According to the Tysabri official website: "TYSABRI® (natalizumab) is a prescription medicine used to treat adults with relapsing forms of multiple sclerosis (MS) to slow the worsening of symptoms common in people with MS and to decrease the number of flare-ups (relapses). TYSABRI increases the risk of progressive multifocal leukoencephalopathy (PML)." . . . "During an infusion, fluid flows from a sterile bag through plastic tubing and a small needle into a vein in your arm. The infusion takes about an hour. You will be asked to wait for another hour to make sure you are not having a reaction that may need medical attention."  TYSABRI, www.tysabri.com. (2015).

pharmacological therapy in the last two years with relief in symptoms.  She had Tysabri infusions once a month.

Claimant was able to dress and feed herself, and stand at one time for 15 minutes and for one to two hours of an eight-hour day.  She could walk on level ground for 20 minutes and sit for 45 minutes.  She could lift up to 40 pounds and drive for about one and a half hours.  She could do sweeping, some cooking, some dishes and shopping.  She could not do mopping, vacuuming, climbing stairs or mowing grass.

On examination, claimant could get on and off the examination table and up and out of the chair without difficulties.  (Tr. 226).  Her visual acuity without correction was 20/50 on the right and 20/40 on the left.

Claimant had normal gait, hand grip, strength and grasping.  Range of motion in the extremities was normal.  Straight leg raising was negative.  She could lay straight back and roll from back to side on the exam table, walk on her heels and toes, and squat 80-90 percent.

Neurologically, claimant could follow simple and complex directions.  Her affect was appropriate.  Motor performance was 5/5 and muscle strength was normal.  She had no clinically significant sensory deficit.  Cranial nerves were intact.  Deep tendon reflexes were mildly increased in both knee joints.

Dr. Bamgbola noted that claimant had history and clinical features consistent with multiple sclerosis in the last two years, and had had a few relapses. He noted that apart from the weakness of the left medial rectus, she had no functional limitation at the time of evaluation. He observed that response to initial treatment was associated with better prognosis, but life expectancy was about five to 10 years shorter than the normal population. He stated that occurrence of relapses were "poorly predictable." (Tr. 227).

**(5) Consultative Psychological Examination by Dr. Eric Cerwonka (undated)**. Claimant reported that she was diagnosed with ADHD when she was 18 or 19 years old, for which she was taking Adderall, and MS for which she was getting Tysbri infusions. (Tr. 230). On examination, her mood appeared euthymic and her affect was mood congruent. Her thinking was organized and goal directed. She was alert and oriented.

Claimant's remote memory was intact, and immediate and delayed recall was good. Her attention and concentration skills were good. Estimated intelligence was in the average range.

Persistence and pace were good. Insight and judgment appeared to be good. Claimant reported that she could stand and sit for short periods, walk short distances, lift, bathe, groom, dress, shop, cook, do household chores and drive.

6

Dr. Cerwonka's assessment was ADHD (by history). Claimant's Global Assessment of Functioning ("GAF") score was 75. He opined that claimant appeared to have obtained a good effect from her medication regimen, and that ADHD would not prevent her from working. He concluded that she did not seem to have any psychiatric, cognitive or behavioral problems that would prevent her from regular, full-time work.

**(6) Records from Dr. Chad Manual dated December 20, 2010 to October 29, 2013**.[6] On September 30, 2011, claimant requested that her family physician, Dr. Manual, increase her Adderall because she had been having a lot of fatigue with her MS lately. (Tr. 250). On December 22, 2011, her medications were working well. (Tr. 249).

On April 26, 2012, claimant reported that her MS had relapsed three weeks prior. (Tr. 247). She was waiting to start her new MS medication. Dr. Manual increased her Adderall due to her complaints of fatigue.

On October 16, 2012, claimant's medications were working well. (Tr. 245). Her MS was stable on Tysabri. (Tr. 243-45).

---

[6]These records were submitted to the Appeals Council, which denied the request for review on November 26, 2013. (Tr. 1-6).

7

**(7) Records from OLOL Neurology Center dated May 17, 2012 to October 8, 2013**.[7] A brain MRI dated October 24, 2012, was stable compared to the previous examination. (Tr. 284).

On January 9, 2013, Dr. Snatic reported that claimant's last infusion went well. (Tr. 283). A follow-up MRI on March 20, 2013, was stable. (Tr. 281).

Records from the OLOL fusion clinic indicated that claimant had monthly Tysabri injections from May 17, 2012 to October 8, 2013. (Tr. 280).

**(8) Claimant's Administrative Hearing Testimony**. At the hearing on August 28, 2013, claimant testified that she was five feet eight inches tall and weighed 170 pounds. (Tr. 34). She had completed some college. (Tr. 35). She had past relevant work as a pro shop assistant at a casino.

Regarding complaints, claimant reported that she got tired very easily and had to sleep during the day at least twice a week. (Tr. 36, 44). She also said that she had difficulty with memory, frequent joint pain, headaches, neck pain and muscle weakness. (Tr. 36).

As to treatment, claimant reported that she had been receiving injections every four to five weeks since May, 2012. (Tr. 36-37). She stated that about a week before her infusion, "everything kind of goes downhill." (Tr. 37). She said

---

[7]These records were submitted to the Appeals Council.

that she would start to have a droopy eye, became "extra tired and kind of dizzy or cloudy."

Claimant testified that the Tysabri infusion process lasted about four hours. (Tr. 41). She said that she was tired and groggy after the shot, but felt better a few days later. She also saw Dr. Snatic every three months, and had brain MRIs four times a year, unless she had a flare-up. She reported that her last flare-up was around Christmas the previous year.

Additionally, claimant stated that she had ADD, for which she had been taking Adderall since about 1999. (Tr. 37).

Regarding activities, claimant testified that she took care of her little boy, prepared meals, did some household chores and grocery shopped. (Tr. 38). She said that one of her aunts or a cousin usually stopped by her house daily. She reported that she played tennis about once a month for 30 minutes to an hour. Additionally she drove about 15 miles per day, usually to her grandparents' house, to the grocery store, or to run errands. (Tr. 35).

As to restrictions, claimant testified that it was difficult for her to pick up her little boy. (Tr. 39). She also said that she became tired or agitated a lot. Additionally, she stated that someone had to help her with mopping, and she had trouble doing things like cooking when her vision was bad. (Tr. 39-40).

Claimant testified that she had vision problems a couple of times a month. (Tr. 40). She said that she had bad days about 60 percent of the time.

**(9) Administrative Hearing Testimony of Jeanne Laborde**. Ms. Laborde testified that she was claimant's aunt and a practicing attorney. (Tr. 46, 50). She lived about three or four houses down from claimant and saw her daily. (Tr. 46). She noticed that claimant became very tired prior to her infusions, and seemed to be worn out and not have any energy about a week of every month. (Tr. 47).

Additionally, Ms. Laborde testified that claimant was absent-minded about three weeks out of the month. (Tr. 48). She also observed that claimant had vision problems on a number of occasions. (Tr. 48-49).

**(10) Administrative Hearing Testimony of P.J. Laborde, Jr**. Mr. Laborde testified that he was a retired appellate court judge and a practicing attorney. (Tr. 53). He stated that he had reared claimant, who was his granddaughter, since she was five years old. He reported that after finishing high school, she had worked at his law firm as a runner.

Mr. Laborde reported that over the last several years, claimant was often forgetful and confused. (Tr. 54-55). He also said that she became tired frequently. (Tr. 56). He said that he "picked up her slack" in every way that he could, because she was "physically incapable of doing so."

**(11) Administrative Hearing Testimony of Mark Cheairs, Vocational Expert ("VE")**. Mr. Cheairs classified claimant's past work as a flower shop worker or salesperson as light with a Specific Vocational Preparation ("SVP") of 4; furniture salesperson as light with an SVP of 4; retail salesperson as light with an SVP of 3; receptionist as light with an SVP of 3 and uniform salesperson as light with an SVP of 6. (Tr. 58). The ALJ posed a hypothetical in which he asked the VE to assume a claimant with the same work experience who would have to miss three to five days of work per month due to MS symptoms, treatments and the aftermath of treatments. (Tr. 58). In response, the VE testified that claimant could not perform any of her past work or any other work.

**(12) The ALJ's Findings**. Claimant argues that the ALJ: (1) failed to evaluate the credibility of lay witnesses Jeanne Laborde and P.J. Laborde, Jr. and failed to weigh their testimony; (2) failed to properly evaluate claimant's credibility under controlling law; (3) failed to evaluate the effects of claimant's medical treatment on her ability to sustain employment; (4) failed to evaluate the side of effects of her medication, Tysabri, in assessing her credibility and residual functional capacity ("RFC"); (5) failed to evaluate all relevant evidence, including lay witness testimony, in assessing her RFC, and (6) improperly rejected evidence of and failed to account for her non-exertional impairments in assessing her RFC;

11

consequently, the ALJ's RFC assessment was reached through improper application of controlling legal standards and is not supported by substantial evidence.

Because I find that the ALJ erred in failing to properly assess claimant's ability to maintain employment due to her multiple sclerosis and the effects from her medical treatment, I recommend that this matter be **REVERSED**, and that claimant be awarded benefits.

The listing for multiple sclerosis provides:

11.09 *Multiple sclerosis*. With:

A. Disorganization of motor function as described in 11.04B;[8] or

B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or

C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the

---

[8]Section 11.04B provides: "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." Section 11.00C provides: "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

> central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.09.

The ALJ found that claimant had some issues caused by her multiple sclerosis, but did not find them to be as severe as she had alleged. (Tr. 21). While she stated that she had considered the witness testimony, the third-party function reports and the medical evidence, the ALJ determined that the overall record did not support the disabling level of severity alleged by claimant and the witnesses.

In support of her opinion, the ALJ cited the fact that as of claimant's last visit shown in the record, she reported feeling better overall. Additionally, the ALJ noted that while claimant had alleged ongoing injections, the record did not support this treatment. (Tr. 22). Further, the ALJ observed that the last treatment records shown in the file were from July 2012, which led her to believe that claimant's MS symptoms were not as severe as she had alleged.

However, the additional medical evidence submitted to the Appeals Council indicates that claimant continued to be treated after July, 2012 by Drs. Manual and Snatic. Additionally, she had monthly Tysabri injections from May 17, 2012 to October 8, 2013. (Tr. 280). Further, claimant testified that she became tired very easily, occasionally absent-minded and had blurry vision, which was confirmed by

the two witnesses at the hearing. (Tr. 36, 44, 46-48, 55-56).

Moreover, the medical reports support claimant's testimony that she had unpredictable exacerbations of her condition. (Tr. 202, 226). The reports from claimant's treating neurologist, Dr. Snatic, confirm that claimant's MS flared up unpredictably. (Tr. 200, 202, 204). Even the consultative examiner, Dr. Bamgbola, upon whose opinion the ALJ heavily relied, acknowledged that occurrence of MS relapses were "poorly predictable." (Tr. 21, 227).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton,* 209 F.3d at 455 (*citing* 20 C.F.R. § 404.1527(d)(2)).

Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is

conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id*. at 456.

Further, it is well established that the opinion of a specialist generally is accorded greater weight than that of a non-specialist. 20 C.F.R. § 404.1527(c)(5); *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Forest ex rel. H.S.M.D. v. Social Security Administration*, 2015 WL 222345, *4 (E.D. La. Jan. 14, 2015).

Here, claimant's treating neurologist, Dr. Snatic, noted occasional flare-ups in her condition which were confirmed by brain MRI. (Tr. 200, 202, 204). Additionally, he prescribed Tysabri injections, which were administered monthly from May 17, 2012 to October 8, 2013. (Tr. 280). The consultative examiner, Dr. Bamgbola, confirmed that claimant had history and clinical features consistent with multiple sclerosis, and had had a few relapses. (Tr. 226-27). However, the ALJ did not consider the effect of claimant's unpredictable flare-ups of MS on her ability to maintain employment.

The Commissioner's regulations state that for impairments such as multiple sclerosis, "consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Subpart P, App. 1, § 11.00D. Further, "[m]ost cases of MS involve intermittent periods of symptoms and signs (exacerbation) followed by a period of improvement

(remission). Excerbations [sic] vary in frequency, duration, character and severity. Remissions similiarly [sic] vary in duration and in the extent of improvement." *Gewin v. Astrue*, 2011 WL 3924232, at *4 (W.D. La. Aug. 3, 2011) (Hayes, J), *report and recommendation adopted*, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (*citing* Program Operations Manual System ("POMS") DI 24580.015 EVALUATION OF MULTIPLE SCLEROSIS (MS)).[9]

In other words, multiple sclerosis, as experienced by claimant, presents the type of impairment that waxes and wanes in its manifestation of disabling symptoms. *Id*. Under these circumstances, the ALJ is compelled to make a separate finding that the claimant is able to maintain employment. *Id*.(*citing Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002).

According to *Watson*, "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it

---

[9]The Program Operations Manual System (POMS) can be found on The Official Website of the U.S. Social Security Administration at https://secure.ssa.gov/apps10. While POMS guidelines do not have the force and effect of law, they do have some value, effect, and persuasive force. 1 Soc. Sec. Law & Prac. § 1:27. POMS are not binding on the Commissioner, but they may be viewed as binding on an ALJ in a case that falls squarely within one of the provisions. *Id*. The courts generally defer to POMS provisions unless a court determines that they are arbitrary, capricious, or contrary to law. *Id*.

also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Watson*, 288 F.3d at 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity." *Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978); *Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it. *Watson*, 288 F.3d at 218. The record established that claimant's multiple sclerosis and treatment caused unpredictable flare-ups. Thus, the ALJ's failure to consider the effect of claimant's MS on her ability to do full-time work constitutes error.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **REVERSED**, and that claimant be awarded benefits as of her onset date of December 1, 2010, through her date last insured of September 30, 2012.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections

with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed June 30, 2015, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE